# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 19, 2004       Decided January 14, 2005

No. 04-1021

AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL
EMPLOYEES CAPITAL AREA COUNCIL 26,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

---

On Petition for Review of an Order of the
Federal Labor Relations Authority

---

*Sarah J. Starrett* argued the cause for petitioner. With her
on the briefs was *Barbara J. Kraft.*

*David M. Shewchuk*, Attorney, Federal Labor Relations
Authority, argued the cause for respondent. With him on the
brief were *David M. Smith*, Solicitor, and *William R. Tobey*,
Deputy Solicitor.

Before: RANDOLPH, ROGERS, and ROBERTS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: Petitioner American Federation of
State, County & Municipal Employees Council 26 ("the Union")
challenges an order of the Federal Labor Relations Authority.
The Union charged the Federal Aviation Administration before

the FLRA with engaging in an unfair labor practice when it refused to execute an agreement reached by the two parties. The Authority dismissed the complaint, finding that the agreement was only tentative and therefore not binding on the FAA. In its petition for review, the Union argues that the Authority's decision (1) is unsupported by substantial evidence and (2) represents an unexplained departure from Authority precedent. We find that the decision is supported by substantial evidence and is not inconsistent with the Authority case law to which the Union directs us. We therefore deny the petition.

## I.

This case arises out of negotiations over a collective bargaining agreement covering four units of FAA employees in Washington, D.C. The Union acted as the exclusive representative of the employees. The two sides began negotiations with preliminary discussions in April 2000 continuing until February 2001, at which point they appeared to have settled on the terms of an agreement. The heart of this dispute is whether the agreement was final. The Union argues that it was and the FAA was therefore legally bound to execute it. The FAA takes the opposite view, asserting that the agreement was only tentative pending approval by the Office of Management and Budget.

When the FAA refused to execute the agreement because OMB had not yet approved it, the Union charged the FAA with committing an unfair labor practice. It is an unfair labor practice for an agency to refuse to negotiate with the representative of its employees in good faith. 5 U.S.C. § 7116(a)(5). This duty includes the obligation, "if an agreement is reached, to execute on the request of any party to the negotiation a written document embodying the agreed terms, and to take such steps as are necessary to implement such agreement." *Id.* § 7114(b)(5).

The matter was referred to an administrative law judge for a hearing. There, the two parties offered conflicting accounts of

their negotiations. The FAA claimed that it first informed the Union in April 2000 that any agreement would not be final until approved by OMB. Anthony Herman, one of the FAA's representatives, testified that he discussed the requirement of OMB approval with the Union's primary representative, Steven Kreisberg, at their first preliminary meeting. The issue arose again at the first bargaining session in July when Herman told Union representatives that no agreement would be final until approved by the Secretary of Transportation, OMB, and Congress. According to Herman, the Union was well aware of that condition. Union President Gerry McEntee, who was present at the preliminary meeting, began referring to the issue as "the OMB problem" and once offered to call President Clinton if the problem ever became serious. *Dept. of Transp., Fed. Aviation Admin. v. Am. Fed'n of State, County & Mun. Employees Council 26*, 59 F.L.R.A. 491, 497 (2003).

The Union offered a different version of events. Its representatives say they never agreed to OMB approval as a condition of final agreement. According to Union witnesses, the issue was not even mentioned until the fall of 2000. During intense negotiations over pay, they say, Herman told the Union that he had multiple constituents to satisfy, including OMB. Kreisberg then demanded that the FAA bring fully authorized negotiators to the table. According to Union witnesses, Herman responded that he needed prior OMB approval for offers regarding pay, but had full authority to negotiate once he came to the table. An FAA witness gave a similar account of this incident, with an important difference: he stated that FAA representatives made clear only that they had full authority to negotiate a *tentative* agreement, but nothing would be final until OMB approval.

Negotiations continued into January 2001. The issue of OMB approval arose many times, but the parties disagree sharply about the context. The Union maintains that the issue

was prior approval of pay offers; the FAA that approval was a condition of final agreement. On January 19, the two sides — with the outgoing Secretary of Transportation present — reached agreement on pay increases. Officials from the FAA insisted, however, that the details of the agreement not be released until the incoming Secretary, Norman Mineta, was briefed on the deal. Someone from the Union's side apparently let the matter slip, and Herman fired off an email reminding Kreisberg that "there is no agreement until Secretary-designate Minetta [sic] has been briefed." *FAA*, 59 F.L.R.A. at 499. The email did not mention OMB approval.

The issue of OMB approval came up several times as negotiations neared their conclusion. FAA negotiators recall a January 24 bargaining session at which Herman told the union: "We're very worried that we're not going to get OMB approval. It's a new Administration. It's a new time. We don't know what this OMB is going to say." Kreisberg merely responded, "I understand." *Id.* at 500. Union witnesses testified that the OMB issue arose when a bargaining session scheduled for January 30 was postponed because FAA negotiators had not received "external clearances." *Id.* It was not clear at the time what this meant. According to Union witnesses, several days later Herman and Ray Thoman, another FAA representative, informed the Union that the problem had been resolved, specifically mentioning that they had received OMB approval, and that they were ready to make an offer regarding pay.

The two sides reached agreement on the remaining terms on February 5. Their apparent misunderstandings about OMB approval then came to a head. Union witnesses say that Thoman told them to delay announcing the agreement until OMB approved, which he expected would take only a day. Kreisberg objected to OMB approval but agreed nevertheless to delay the announcement. As it turned out, OMB consideration took longer than anticipated. When no answer came the next day, the

Union proceeded with ratification. The final agreement was submitted to a vote and approved by the membership on February 21.

The same day, the two sides began an exchange of emails about OMB approval. Herman emailed Kreisberg to remind him that there was no final agreement until OMB approved. Kreisberg responded that he objected to OMB having final authority over the agreement. A subsequent email from Kreisberg informed Herman that the agreement had been ratified. Herman answered that he was "pleased" but that there was no deal until OMB completed its review. Kreisberg again objected.

On February 26, the Union sent a letter to Thoman and Herman requesting execution of the agreement. Herman replied that execution "would be inappropriate" because OMB had not yet approved. The Union filed its unfair labor practice charge with the FLRA on March 20. On May 9, a letter from Herman informed the Union that OMB had declined to approve the deal.

After hearing the evidence, the ALJ concluded that the FAA had not committed an unfair labor practice because final agreement was premised on OMB approval. Her analysis proceeded in two parts. First, she explained, under Authority precedent, an "agreement" for purposes of section 7114(b)(5) is "one in which authorized representatives of the parties come to a meeting of the minds on the terms over which they have been bargaining." *FAA*, 59 F.L.R.A. at 505. An agreement reached by representatives who are not fully "authorized" is therefore not final and need not be executed. Second, she considered whether the Union had waived its statutory right to deal with authorized representatives of the FAA. This right is found in the duty of good faith, which includes the obligation "to be represented at the negotiations by duly authorized representatives prepared to discuss and negotiate on any condition of employment." 5 U.S.C. § 7114(b)(2). A union may waive this right,

the ALJ reasoned, but to be valid, any waiver must be clear and unmistakable.

Applying this framework, the ALJ found that the FAA's negotiators were not "authorized" within the meaning of the statute, but that the Union had waived its right to have such negotiators. The FAA had "clearly set forth its position on OMB approval during the negotiations." *FAA*, 59 F.L.R.A. at 506. The judge credited FAA representatives Herman and Thoman, finding their testimony "consistent and logical within the time frame of extended negotiations," assigning particular weight to Herman's conversations with McEntee about "the OMB problem." *Id.* She also relied on evidence presented at the hearing showing that negotiations between the FAA and several other employee units were made contingent on OMB approval. It was "difficult to believe" that the Union was not aware of this. *Id.* On the issue of waiver, the ALJ found "that the evidence establishes a clear and unmistakable waiver of the Union's statutory rights with regard to the [FAA] having authorized representatives at the table." *Id.*

The Authority partially affirmed the ALJ's ruling. It found that the record evidence supported "the [ALJ's] finding that the Union acquiesced in the requirement for OMB approval." *Id.* at 493. The Authority declined, however, to address whether the ALJ "failed to properly apply the law of waiver" or "whether the [ALJ] erred in finding that there was no final agreement because the Respondent's representatives were not authorized to bargain." *Id.*

**II.**

Our review of the Authority's order is limited to determining whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), 7123(c); *Nat'l Ass'n of Gov't Employees v. FLRA*, 363 F.3d 468, 474 (D.C. Cir. 2004). We are required to uphold the Authority's findings of fact if supported by substantial evidence "on the record considered as a whole." 5 U.S.C. § 7123(c). Under this standard, the Authority's judgments need not be right in our eyes, but they must come with "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Thomas v. NLRB*, 213 F.3d 651, 657 (D.C. Cir. 2000). We are furthermore barred from considering any objection by the Union that was not urged before the Authority "unless the failure or neglect to urge the objection is excused because of extraordinary circumstances." 5 U.S.C. § 7123(c); *see EEOC v. FLRA*, 476 U.S. 19, 23–24 (1986) (per curiam); *Nat'l Ass'n of Gov't Employees*, 363 F.3d at 475.

The Union begins by arguing that the Authority lacked substantial evidence to support its conclusions. In particular, it contends that there was insufficient evidence that the FAA made the OMB approval requirement plain or that the Union had acquiesced in any such condition.

We think that the Authority's decision has sufficient support in the record. The evidence placed it in a difficult position: the two sides' versions of events were plainly inconsistent. *See FAA*, 59 F.L.R.A. at 505 ("Although the witnesses for both parties were clearly at the same negotiations, which lasted a period of several months, there is no similarity with regard to the OMB approval issue."). The FAA says that it brought up the issue of OMB approval in its very first meeting with the Union; the Union says it was not raised until the fall, several months after negotiations began. Even where there is agreement that

OMB approval was raised, the context is disputed. In the Union's view, the issue was approval of FAA offers; in the FAA's view, it was approval of the final agreement.

The Authority's decision thus hinged on which version of events it found more credible. We normally accord substantial deference to such determinations unless they are "'hopelessly incredible,' 'self-contradictory,' or 'patently unsupportable.'" *United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 913 (D.C. Cir. 2004); *see also Nat'l Ass'n of Gov't Employees v. FLRA*, 770 F.2d 1223, 1226 (D.C. Cir. 1985). Here, the Authority expressly relied on the ALJ's decision to credit the testimony of FAA representatives Herman and Thoman. The ALJ found their testimony "consistent and logical within the time frame of the extended negotiations." *FAA*, 59 F.L.R.A. at 506. She based this determination, in part, on testimony concerning Union President McEntee's references early in the negotiations to "the OMB problem." *Id.* McEntee himself did not appear at the hearing, and the Union did not deny Herman's testimony on this point. We find nothing "unsupportable" in the Authority's decision to credit the testimony of the FAA witnesses.

The Union nevertheless points to two aspects of the record that it believes undermine the Authority's ruling.[1] First, it cites "undisputed" testimony that, during a bargaining session in the

---

[1] The Union focuses much of its argument on the ALJ's supposed factual findings, which in its view contradict the Authority's conclusions. It cites, for example, the ALJ's finding that "[t]he Union never agreed that OMB approval of the agreement would be all right." Pet. Br. at 17. On its face, of course, this statement seems to do considerable damage to the Authority's ruling. It is explained, however, by the (admittedly confusing) way in which the ALJ presents the facts in her opinion, as the Authority points out. *See* Resp. Br. at 17–18. The "Statement of Facts" section does not lay out the ALJ's *findings* — those appear in the "Analysis and Conclusion" section — but only summarizes the testimony of each side's witnesses.

fall of 2000, Kreisberg angrily demanded that the FAA bring fully authorized negotiators to the table. *See* Pet. Br. at 17. Yet this event, too — like much else — is a subject of disagreement. The Union contends that Kreisberg's objection led to assurances from Herman and Thoman that they had authority to reach a final agreement and needed OMB approval only prior to making offers. Herman and Thoman insist that they promised no more than full authority to negotiate a *tentative* agreement. The ALJ resolved these conflicting accounts by crediting one side's version over the other's, and we have no basis for faulting that determination.

Second, the Union suggests that Herman's January 23, 2001 email and a handwritten notation accompanying a pay agreement from the same time period demonstrate that the only condition of final agreement was review by the Secretary. The absence of a mention of OMB in either document, the Union argues, shows that final agreement was not conditioned on OMB approval.

We do not find this contention a sufficient basis for overturning the FLRA decision. First, the handwritten notation is hardly the sort of evidence that would lead us to disturb the Authority's factual findings. It shows only a sentence, crossed-out, conditioning the agreement on the Secretary's approval — too inscrutable to invite any obvious inferences. The email from Herman offers more, but not enough. It does state, with reference to articles regarding pay, that "there is no agreement until Secretary-designate [Mineta] has been briefed." Herman Email, Jan. 23, 2001. But the email does not make clear that the "agreement" it refers to is anything more than the usual (in the FAA's view) tentative agreement reached by the parties at the bargaining table; nor does it rule out OMB approval as a condition of a final agreement. *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (canon of expressio unius "depends on identifying a series of two or more terms or things

that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded"). It does not, standing alone, undermine the other evidence before the ALJ.

Finally, the Union urges that the Authority lacks substantial evidence for the finding that OMB actually rejected the agreement.[2] It relies on a draft email from an OMB official stating that the "final decision of whether to enter into the agreement rested with the FAA's management." Oliver Email, July 20, 2001. The Authority's principal response is that, since the final agreement was conditioned on OMB *approval*, the issue is not whether OMB rejected the agreement but only whether it ever approved it. That may be, but we need not resolve the issue. As the Authority points out, Herman testified that he was there in person when OMB called to reject the agreement. This evidence adequately supports the finding that OMB rejected the agreement.

## III.

The Union's remaining argument is of a different kind. It contends that the Authority departed from its own precedent without explanation when it found that "the Union 'acquiesced' in the waiver of its statutory rights but fail[ed] to find that the Union 'waived' those rights." Pet. Br. at 27. This argument invokes an important principle in our review of agency action: reasoned decision-making demands "treating like cases alike."

---

[2] Normally, when the two sides reached agreement on specific provisions, they initialed them to indicate that they had completed discussion on those issues. Because the two sides had reached an agreement over pay at an awkward time — just days before a new Administration was to take office — the FAA requested that the details not be released until the incoming Secretary-designate had been briefed. It was one Union official's disregard of this request that prompted Herman's email.

*Envtl. Action v. FERC*, 996 F.2d 401, 412 (D.C. Cir. 1993). An agency is free to change course, but when it does, it must provide "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Nat'l Fed'n of Fed. Employees v. FLRA*, 369 F.3d 548, 553 (D.C. Cir. 2004); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

The sole issue here is whether the Authority did, in fact, depart from its precedent. The Union argues that under Authority precedent the issues of waiver and acquiescence are "inextricably intertwined." Reply Br. at 15. Mere acquiescence, on this view, does not satisfy the heightened standard for finding a waiver of the Union's right under 5 U.S.C. § 7114(b)(2) to negotiate with duly authorized representatives of the FAA. The Authority's view differs so greatly that the parties hardly join issue here. Its order declines to address the subject of waiver, viewing it as irrelevant to the decision where a mere finding of acquiescence would suffice. Parties to a labor negotiation, in its view, are free to set conditions of final agreement without implicating the rigorous waiver standard. Furthermore, the Authority claims, the issue of waiver is "not a part of this case" because it was not part of the unfair labor practice complaint filed with the Authority.[3]

The crux of the dispute, then, is over the place of the waiver standard in the Authority's case law. If, under the Authority's precedents, the Union need only acquiesce to the condition of OMB approval, then waiver is irrelevant to the Authority's ruling. If, however, the Authority's precedents mandate the

---

[3] In fact, the complaint specifically states: "Herman and Thoman were the chief negotiators for the Respondent during the negotiations . . . and had full authority to negotiate a collective bargaining agreement on behalf of the Respondent." Unfair Labor Practice Complaint ¶ 14.

Union must first clearly and unmistakably waive its statutory right under section 7114(b)(2) for a condition such as OMB approval to be valid, then the Authority was required to address the issue in its ruling.

The Union cites four Authority cases for its view that waiver and acquiescence are "intertwined," none of which, in the end, says what the Union needs them to say. *See* Pet. Br. at 25; Reply Br. at 18. Three of these cases stand for no more than the proposition that a party to a labor negotiation must notify the other side of any limitations on its representatives' authority for those limitations to be effective. *See Dept. of Transp., Fed. Aviation Admin., Standiford Air Traffic Control Tower v. Nat'l Air Traffic Controllers Ass'n*, 53 F.L.R.A. 312, 319–20 (1997) (agreement found where employer representative "never informed" union that agreement would be merely tentative); *Nat'l Council of Soc. Sec. Admin. Field Operations Locals v. Lepore*, 21 F.L.R.A. 319, 331 (1986) (agreement found where union did not show that agency had "prior knowledge" of restrictions on union's representative); *Long Beach Naval Shipyard v. Fed. Employees Metal Trades Council*, 7 F.L.R.A. 102, 113 (1981) (agreement found where employer representative "never mentioned any limitations on his authority"). We find no suggestion in any of these cases that this notice requirement is equivalent to the waiver standard.

The fourth case cited by the Union offers still greater support for the Authority's ruling. In *Internal Revenue Service, Brooklyn District v. National Treasury Employees Union*, 23 F.L.R.A. 63 (1986), the union charged the Internal Revenue Service (IRS), as here, with failing to execute a final agreement. The IRS answered that it was not bound because its representative only had authority to reach a tentative agreement. The ALJ agreed, finding that IRS representatives told the union of their limited authority at the outset of negotiations. *Id.* at 84. Nevertheless, she proceeded to apply the waiver standard and

determined that the IRS, while not bound by the agreement, had violated its duty of good faith under section 7116(a)(5) by failing to send authorized representatives to the negotiations. Both holdings were affirmed by the Authority.

Under *Brooklyn District*, waiver is plainly distinct from "notice" or "acquiescence." The first applies to the statutory right, under section 7114(b)(2), to bargain with duly authorized representatives; the second applies where the ultimate issue is the duty to execute an agreement under section 7114(b)(5). This division of labor hurts the Union because the sole issue in this dispute is whether FAA failed to execute a final agreement, which would not implicate the waiver standard. In short, the Union cannot argue that the Authority's refusal to apply the waiver standard is a departure from any of the Authority precedents it cites.

There is a 1992 Authority decision that offers some support for the view that the waiver standard should be applied even where the charge is failure to execute. In *Department of Navy, Portsmouth Naval Shipyard v. Federal Employees Metal Trades Council*, 44 F.L.R.A. 205 (1992), the union charged the shipyard with failing to execute a final agreement after representatives for both sides agreed to terms at the bargaining table. The ALJ found that the agreement was not sufficiently final to trigger an obligation to execute under section 7114(b)(5) because the practice at the shipyard — which the union's representative "knew, or should have known" — was that no agreement was final until it was reviewed by the shipyard's employee relations division and signed by the appropriate official. *Portsmouth*, 44 F.L.R.A. at 215.

While the ALJ did not apply the waiver standard in reaching this conclusion, the Authority evidently felt compelled to do so. It noted that

> the [ALJ] did not explicitly state whether the practice . . . constitutes a clear and unmistakable waiver by the parties of their right under section 7114 (b)(2) of the Statute to have the other party send fully authorized representatives to the bargaining table.

*Id.* at 206–07. Having then proceeded to apply the waiver standard, the Authority concluded:

> Because we find that the parties clearly and unmistakably waived their right under section 7114(b)(2) of the Statute by virtue of their practice, as discussed above, we agree with the [ALJ] that the oral agreement reached at the end of the third bargaining session was only "a tentative agreement" subject to review and approval by both parties.

*Id.* at 208.

It could reasonably be argued that the Authority's reasoning in *Portsmouth* is at odds with the Authority's order in the case before us. *Portsmouth* suggests that the waiver standard should apply even in cases, like this one, brought under section 7114(b)(5) for failure to execute an agreement. Indeed, *Portsmouth* appears to leave little room for the acquiescence standard at all, but only for one standard: clear and unmistakable waiver. The order before us seems to take a different approach. It finds acquiescence while expressly declining to address the issue of waiver. The two are therefore treated by the Authority as distinct standards, with only the less stringent acquiescence standard applicable where the issue is failure to execute a final agreement — a conclusion consistent with *Brooklyn District*, but a departure from the more recent *Portsmouth* for which the present order provides no explanation. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) ("An agency's failure to come to grips with conflicting precedent constitutes an

inexcusable departure from the essential requirement of reasoned decision making." (internal quotation marks omitted)).

But this is not the argument made by the Union before this court or, for that matter, before the Authority. At no time does the Union ever suggest that *Portsmouth* was inconsistent with the Authority's ruling. In its briefs to us, it cites *Portsmouth* once, and only for the uncontested proposition that an agency is required by statute to execute a final agreement. *See* Pet. Br. at 27–28. Pressed at oral argument, counsel for the Union in fact appeared to acknowledge that waiver and acquiescence were distinct standards and that both were at issue — a striking admission given that the ALJ's opinion is not at all clear on this point and relied heavily on *Portsmouth* for its reasoning.[4] *See* Oral Arg. Tr. at 3:44–:48 ("the ALJ actually had found that there was both acquiescence and waiver"). The Union proceeded in a similar fashion before the Authority, citing *Portsmouth* three times, none relating to the applicability of the waiver standard. Instead, as we have noted, *supra* at 12–13, it points us — as it did the Authority — to several cases that are consistent with the Authority's order and require no explanation.

We find therefore that we have no basis on which to disturb the Authority's ruling. Two considerations lead us to this conclusion. The first follows from the familiar rule that we generally will not consider arguments not sufficiently raised by the parties. *See Barr v. Clinton*, 370 F.3d 1196, 1204 (D.C. Cir. 2004); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). A party arguing that an agency has departed from its precedent without explanation should, at a minimum, direct the court to the relevant precedent and explain how it is inconsistent with the

---

[4] Although the ALJ opinion cites *Portsmouth* only once, several paragraphs of its legal analysis are borrowed verbatim from *Portsmouth*, including some of the language quoted above. *Compare FAA*, 59 F.L.R.A. at 505, *with Portsmouth*, 44 F.L.R.A. at 206–07.

agency's ruling. Imprecise charges of inconsistency, brought in the hope that an appellate court will uncover an agency precedent to support them, will not do.

The second consideration is jurisdictional, and therefore more serious. Our jurisdiction to review the Authority's decisions does not extend to an "objection that has not been urged before the Authority." 5 U.S.C. § 7123(c); *EEOC*, 476 U.S. at 23 (Court of Appeals is "without jurisdiction to consider an issue not raised before the Board if the failure to do so is not excused by extraordinary circumstances" (internal quotation marks omitted)). Neither the Union's brief to the Authority nor its post-hearing brief to the ALJ argued that *Portsmouth* required application of the waiver standard. We may not, therefore, review the Authority's judgment on this ground. The FLRA is the expert on labor relations in the federal government; it is statutorily entitled to first crack at arguments about how to exercise its authority.

For the reasons stated, the petition for review is denied.